IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

MAY 27 2020

ARTHUR JOHNSTON
BY_____ DEPUTY

UNITED STATES OF AMERICA

v.

MITCHELL "CHAD" BARRETT,
DAVID "JASON" RUTLAND, and
THOMAS "TOMMY" WILBURN SHOEMAKER

CRIMINAL NO. 2:20cr16-KSMTP

18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(B)()
18 U.S.C. § 1957
18 U.S.C. § 2

**The Grand Jury Charges:**

At all times relevant to this Indictment:

## GENERAL ALLEGATIONS

### Defendants and Introduction

1.     **MITCHELL "CHAD" BARRETT ("BARRETT")**, of Santa Rosa County, Florida,

was a pharmacist licensed to dispense pharmaceuticals in the State of Mississippi.  **BARRETT**

co-owned, operated, promoted, and expanded several pharmacies and companies located in the

Southern District of Mississippi and elsewhere that procured prescriptions for and ultimately

dispensed compound medications to individuals throughout the United States.

2.     **DAVID "JASON" RUTLAND ("RUTLAND")**, of Hinds County, Mississippi, was a

pharmacist licensed to dispense pharmaceuticals in the State of Mississippi.  **RUTLAND** co-

owned and operated several pharmacies and companies located in the Southern District of

Mississippi and elsewhere that procured prescriptions for and ultimately dispensed compound

medications to individuals throughout the United States.

1

3. **THOMAS "TOMMY" SHOEMAKER ("SHOEMAKER")**, of Ouachita Parish, Louisiana, promoted, solicited, and referred prescriptions for compound medications to pharmacies and companies located in the Southern District of Mississippi and elsewhere in exchange for remuneration.

4. As detailed herein, approximately between September 2011 and January 2016, **BARRETT**, **RUTLAND**, and **SHOEMAKER** (collectively, "**Defendants**") conspired to and engaged in a scheme to defraud numerous health care benefit programs of more than $180 million, including more than $50 million from federal healthcare programs. To that end, **Defendants**, using several pharmacies located in the Southern District of Mississippi and elsewhere, fraudulently formulated, dispensed, shipped, and billed insurance companies for compound medications produced and dispensed by various pharmacies, including pharmacies that **BARRETT** and **RUTLAND** owned and controlled. The **Defendants'** scheme to dispense these compound medications in the form of topical creams, capsules, and other forms, some of which contained controlled substances, to thousands of Americans circumvented federal regulations and approvals regarding use and efficacy of compound medications, and further exploited the manner in which health insurance companies reimbursed the dispensation of compound medications. To further facilitate the scheme to defraud health care benefit programs, the **Defendants** conspired to and engaged in a scheme to solicit and pay kickbacks and bribes to marketers, physicians, other medical providers, and beneficiaries to refer, prescribe, and receive prescriptions for medically unnecessary compound medications. Finally, during the same time frame, **BARRETT**, **RUTLAND**, and **SHOEMAKER** also conspired to and engaged in a scheme to launder the proceeds of their fraudulent activity by concealing the proceeds they obtained and conducting monetary transactions of a value greater than $10,000.

2

## Compound Medications

5.     At all times relevant, Section 505 of the Food, Drug, and Cosmetic Act ("Food and Drug Act") required drug manufacturers and producers to receive approval by the United States Food and Drug Administration ("FDA") before introducing new drugs into interstate commerce.

6.     Section 503A of the Food and Drug Act exempted compound medications from receiving FDA approval if the compound medication was compounded by a licensed pharmacist or other licensed professional, for an identified individual, based on the receipt of a valid prescription that was medically necessary for the identified individual.

7.     In other words, to be exempt from FDA approval, compound medications were drugs that were combined, mixed, or altered by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians, nurse practitioners, dentists, and other health care professionals (collectively, "practitioners"), to meet the specific needs of individual patients.

8.     Practitioners could prescribe compound medications to patients upon considering patients' diagnoses, medical conditions, health factors, and reactions to other medications. Although ingredients in compound medications were generally approved by the FDA, the compounded form of those medications were not.  There were risks associated with prescribing drugs that did not meet federal quality standards, so compound medications were meant to be prescribed when the needs of an individual patient could not be met by an FDA-approved medication.

## Health Care Benefit Programs and Claims Submission Process

9.     The United States Department of Defense, through the Defense Health Agency, administered the TRICARE program ("TRICARE"), which was a comprehensive health care

3

insurance program that provided health care benefits to United States military personnel, retirees, and their families.

10.     In addition, various private insurance companies, including Blue Cross & Blue Shield of Mississippi, A Mutual Insurance Company ("Blue Cross"), provided health care benefits for individuals enrolled with their plans.

11.     TRICARE and these private insurance companies were each a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

12.     Individuals who qualified for TRICARE benefits, and the benefits of other federal health care benefit programs, were referred to as "beneficiaries."

13.     Individuals who were covered under plans issued by private insurance companies, including Blue Cross, were referred to as "members."

14.     Medical service providers, including hospitals, clinics, physicians, nurse practitioners, and pharmacies ("providers"), meeting certain criteria, could enroll with health care benefit programs, including TRICARE and Blue Cross, and provide medical services to beneficiaries and members. Providers would then submit claims, either electronically or in hard copy, to health care benefit programs seeking reimbursement for the cost of items and services provided.

15.     TRICARE, Blue Cross, and the other health care benefit programs provided prescription drug coverage, including prescriptions for compound medications, to eligible beneficiaries and members through their pharmacy programs or similar drug plans.

16.     TRICARE's pharmacy program and other health care benefit programs' drug plans were administered by Pharmacy Benefit Managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible

4

pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

17.     Specifically, TRICARE, through the United States Department of Defense, contracted with Express Scripts to be its PBM.

18.     CVS Caremark was another PBM that provided pharmacy management services to various health care benefit programs.

19.     Providers, including pharmacies, entered into contractual relationships with PBMs, including Express Scripts and CVS Caremark, either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, such as Epic Pharmacy Network, Inc. or Good Neighbor Pharmacy, which then contracted with PBMs on behalf of providers. Providers, whether directly or indirectly, by contracting with PBMs, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

20.     For prescription drugs, including compound medications, to be reimbursed, health care benefit programs required that prescription drugs, including compound medications, be dispensed pursuant to valid prescriptions and be medically necessary for the treatment of covered illnesses or conditions. In other words, health care benefit programs would not reimburse prescription drugs, including compound medications, that were not medically necessary or dispensed without valid prescriptions.

21.     Deductibles were the annual amounts that beneficiaries and members paid for health care services before health care benefit programs covered the costs of any health care services or items received. Irrespective of whether deductibles had been met by beneficiaries or members, copayments, which were set by the health care benefit programs, were the monetary amounts or percentages paid by beneficiaries and members for health care services and items received. In

5

other words, copayments were the beneficiaries' or members' share of the costs for the services and items received.

22.     Most, if not all, PBMs, including Express Scripts and CVS Caremark, required participating pharmacies to collect and make good faith efforts to collect copayments from beneficiaries and members at the time of billing, and specified that copayments could not be systematically waived or reduced.

23.     Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries and members financial incentives to reject medications that were not medically necessary or had little to no value to beneficiaries' or members' treatments.

24.     Upon receiving prescriptions, pharmacies submitted claims for dispensing prescription drugs to health care benefit programs or PBMs. Health care benefit programs or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries or members.

25.     Electronic claims submitted to PBMs by pharmacies located in Mississippi necessarily traveled via interstate wire to be adjudicated. For example, regardless of the location of the pharmacies that provided pharmacy benefits, Express Scripts adjudicated claims submitted electronically in Middlesex County, New Jersey, and CVS Caremark adjudicated claims submitted electronically in Maricopa County, Arizona.

**Reimbursing Compound Medications**

26.     The National Council for Prescription Drug Programs developed standards for electronic pharmacy prescribing and billing transactions. These standards included version "D.0," which allowed pharmacies to submit, and insurance companies to see, each ingredient - quantity and price - included in a compound medication, and reimburse dispensing pharmacies accordingly.

6

27. In 2009, the United States Department of Health and Human Services required pharmacies to be D.0-compliant by January 1, 2012. Prior to being D.0-compliant, providers typically submitted claims for compound medications based on the primary, and typically, the most expensive, ingredient.

28. In complying with D.0, pharmacies submitted claims identifying each ingredient included in dispensed compound medications and were reimbursed accordingly. Consequently, the more ingredients pharmacies included in the compound medications, the higher the reimbursements pharmacies received from the health care benefit programs or PBMs. Compound medications that were reimbursed at high rates were called "high-adjudication."

<strong>Relevant Pharmacies</strong>

29. Gluckstadt Special Care Pharmacy and Compounding, LLC ("Special Care Pharmacy"), formed in May 2010 and located in Madison County, Mississippi, was an open-door, retail pharmacy that specialized in the production of compound medications. **BARRETT, RUTLAND,** and others formed, owned, and operated Special Care Pharmacy, and further solicited and procured prescriptions for compound medications for Special Care Pharmacy. Special Care Pharmacy contracted with TRICARE, through Express Scripts, and other federal and private health insurance companies through other PBMs, to provide health care services and items to beneficiaries and members.

30. World Health Industries, Inc. ("WHI"), incorporated in 2008 and located in Hinds County, Mississippi, in the Southern District of Mississippi, was a licensed pharmacy in the state of Mississippi and a medical equipment provider. In or around late 2011 or early 2012, **BARRETT**, and later **RUTLAND**, assumed control of WHI and shifted WHI's business focus to the production and dispensation of compound medications. Beginning in or around 2012,

7

**BARRETT, RUTLAND**, and others conducted WHI's business in the name of "Rx Pro," and further expanded WHI's business enterprise into other states, ultimately obtaining licensing in other states to dispense compound medications. **BARRETT, RUTLAND**, and others solicited and procured prescriptions for compound medications for WHI, from **SHOEMAKER** and others. WHI contracted with TRICARE, through Express Scripts, Blue Cross, through CVS Caremark, and other health insurance programs through other PBMs, to provide health care services and items to beneficiaries and members. By 2015, **RUTLAND** assumed control of WHI, and in approximately June 2015, WHI began doing business as "Apire Rx" and continued in its production and dispensation of compound medications.

31.    Opus Rx, LLC ("Opus Rx"), formed in March 2015 and located in Hinds County, Mississippi, was an open-door, retail pharmacy that specialized in the production of compound medication. Opus Rx was formed, owned, and operated by **BARRETT**. Beginning in approximately May 2015, **BARRETT** procured prescriptions for compound medications for Opus Rx, from **SHOEMAKER** and others. Opus Rx contracted with TRICARE, through Express Scripts, and other health care benefit programs through other PBMs, to provide health care services and items to beneficiaries and members.

32.    In addition to the above pharmacies owned and operated by **BARRETT, RUTLAND**, and others, **BARRETT** and **RUTLAND** formed, owned, and operated other pharmacies, such as Rx Pro Pharmacy and Compounding, LLC, in Broward County, Florida, among others, and, through WHI, entered into agreements with several pharmacies, such as Mack Bayou Pharmacy, LLC, in Santa Rosa County, Florida, among others (collectively, "affiliate pharmacies"), whereby **BARRETT, RUTLAND**, and others, through WHI, would send affiliate pharmacies prescriptions WHI had procured for compound medication, but – whether because of state licensing issues,

8

volume, or otherwise – that WHI could not fill. Profits from the reimbursement paid by the various health care benefit programs were then split between WHI and the dispensing affiliate pharmacy.

### Relevant Entities

33.     WHIG Enterprises, LLC ("WHIG"), formed in May 2013 and located in Broward County, Florida utilizing the same mailing address as WHI, was owned and operated by **BARRETT**, **RUTLAND**, and others. WHIG was used by **BARRETT**, **RUTLAND**, and others to receive, layer, and pay proceeds from the **Defendants'** fraud scheme.

34.     World Health Industries Holding Company, Inc. ("WHI Holding"), incorporated in February 2014 and located in Hinds County, Mississippi at the same physical location with WHI, was used by **BARRETT**, **RUTLAND**, and others to receive, layer, and pay proceeds from the **Defendants'** fraud scheme.

35.     World Health Jets LLC, formed in October 2013 and located in Hinds County, Mississippi at the same physical location with WHI, was an entity used by **BARRETT**, **RUTLAND**, and others to receive, layer, and pay fraud proceeds and as a holding company for an aircraft that **BARRETT**, **RUTLAND**, and others purchased.

36.     Brew Barr LLC ("Brew Barr"), formed in September 2011 and located in Hinds County, Mississippi at the same physical location with WHI, was an entity used by **BARRETT** to receive, layer, and pay proceeds from the **Defendants'** fraud scheme.

37.     Farm007 Holdings, LLC ("Farm007"), formed in September 2013, located in Laramie County, Wyoming, and registered to do business in Mississippi in July 2015, was an entity used by **BARRETT** and **SHOEMAKER** to receive, layer, and pay proceeds from the **Defendants'** fraud scheme.

38. The Rutland Company LLC, formed in January 2013 and located in Hinds County, Mississippi, was an entity used by **RUTLAND** to receive, layer, and pay proceeds from the **Defendants'** fraud scheme.

39. TSJ Marketing LLC ("TSJ LLC"), formed in August 2014 and located in Ouachita Parish, Louisiana, was an entity used by **SHOEMAKER** and others to receive, layer, and pay proceeds from the **Defendants'** fraud scheme.

40. BAMBR, Inc., ("BAMBR"), formed in September 2012 and located in Hinds County, Mississippi at the same physical location with WHI, was an entity used by **BARRETT, RUTLAND,** and others to pay practitioners kickbacks and bribes on prescriptions written for compound medications that were referred to and dispensed by WHI. BAMBR had several associated entities, including BAMBRPA10, BAMBRUT10, and BAMBRLA10, registered in various states, primarily Florida, out of which practitioners were paid kickbacks and bribes ("associated entities").

41. Affordable Medication Solutions, LLC ("AMS"), formed in March 2014 and located in Ouachita Parish, Louisiana, purportedly provided copayment assistance for compound medications prescribed to beneficiaries and members. In reality, AMS did not provide copayment assistance, but simply made it appear to health care benefit programs that beneficiaries' and members' copayments, or portions thereof, were covered by AMS, purportedly through manufactures' and wholesalers' coupons.

42. Marketing Company 1, formed in May 2012 and located in Broward County, Florida, was a telemarketing firm used by **BARRETT, RUTLAND,** and others to solicit beneficiaries and members to agree to receive compound medications, and further generate prescriptions for compound medications that were referred to WHI, its affiliate pharmacies, and Opus Rx.

10

43. Marketing Company 2, formed in November 2014 and located in Broward County, Florida, was a telemarketing firm – with the same registered agent, manager, and address as Marketing Company 1 – used by **BARRETT, RUTLAND,** and others to solicit beneficiaries and members to agree to receive compound medications, and further generate prescriptions for compound medications that were referred to WHI, affiliate pharmacies, and Opus Rx.

### Relevant Financial Institutions

44. Bancorp South Bank ("Bancorp South") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Bancorp South was headquartered in Mississippi and maintained branch locations throughout the Southern District of Mississippi. Between at least January 2012 and February 2016, WHI held accounts at Bancorp South, including but not limited to account No. xxxx3983. During the course of the **Defendants'** conduct, **RUTLAND** held several accounts at Bancorp South in his own name or in the name of shell entities, including but not limited to "Rutland Company LLC" or "Rutland Family Trust."

45. BankPlus was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. BankPlus was headquartered in Mississippi, and maintained branch locations throughout the Southern District of Mississippi. Between at least May 2012 and February 2015, Brew Barr held accounts at BankPlus, including but not limited to account No. xxxxxx0111.

46. Wells Fargo Bank, N.A. ("Wells Fargo") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Wells Fargo was headquartered in South Dakota and maintained branch locations throughout the Southern District of Mississippi. Between at least May 2012 and

11

June 2015, Rx Pro Pharmacy & Compounding, Inc., a Florida corporation controlled by **BARRETT's** relatives, held accounts at Wells Fargo, including but not limited to account No. xxxx5530. Between at least September 2014 and April 2015, Marketing Company 1 held account No. xxxxx0248 at Wells Fargo.

47.     Community Trust Bancorp, Inc. ("Community Trust") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Community Trust was headquartered in Kentucky, and maintained branch locations in Kentucky, Tennessee, and West Virginia. Between at least May 2012 and June 2015, Farm007 held accounts at Community Trust, including but not limited to account No. xxxxx9720.

48.     Origin Bank was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Origin Bank was headquartered in Louisiana and maintained branch locations throughout the Southern District of Mississippi. Between at least February 2014 and February 2016, Farm007 held accounts at Origin Bank, including but not limited to account No. xxxx3311.

### THE FRAUDULENT SCHEME

#### Overview

49.     **BARRETT, RUTLAND, SHOEMAKER,** and others, through Special Care Pharmacy, WHI, Opus Rx, and affiliate pharmacies, engaged in a scheme and artifice to defraud healthcare benefit programs, and to defraud the United States, through TRICARE, and other federal healthcare programs by:

12

(a) price testing formulas to create medically unnecessary, high-adjudication compound medications for the purpose of maximizing reimbursements;

(b) utilizing the services of telemarketing companies to generate prescriptions for medically unnecessary, high-adjudication compound medications, often without the consent of the beneficiaries and members, or their doctors;

(c) offering and paying kickbacks and bribes to, and the soliciting and receiving kickbacks by, marketers and practitioners in exchange for arranging and recommending medically unnecessary, high-adjudication compound medications to be dispensed to beneficiaries and members;

(d) submitting and causing the submission of false and fraudulent claims to TRICARE and other health care benefit programs;

(e) receiving and obtaining the reimbursements paid by TRICARE and other health care benefit programs based on the false and fraudulent claims submitted;

(f) manipulating and deceiving insurance audits to maintain the ability to submit claims for reimbursement for medically unnecessary, high-adjudication compound medications; and

(g) concealing the offering, paying, soliciting, and receiving of kickbacks and bribes, the submission of false and fraudulent claims to health care benefit programs, and the proceeds earned from those false and fraudulent claims.

### Purpose of the Scheme and Artifice

50.    It was a purpose of the scheme and artifice for **BARRETT, RUTLAND, SHOEMAKER**, and others to unlawfully enrich themselves.

### Manner and Means of the Scheme and Artifice

51.    The manner and means by which **BARRETT, RUTLAND, SHOEMAKER**, and others sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

### Special Care Pharmacy

52.    In or around May 2010, **BARRETT** and **RUTLAND** formed Special Care Pharmacy and engaged in the production of compound medications, in addition to providing other items and services.

53.     At or around that time, **BARRETT** and **RUTLAND** learned of the high reimbursements paid to compounding pharmacies by health care benefit programs for the dispensation of compound medications.

54.     Beginning in or around 2011, in an effort to capitalize on the reimbursements paid for compound medications, **BARRETT, RUTLAND**, and others began to submit test claims – also known as "dummy" claims – to PBMs, so as to ascertain the potential reimbursements to Special Care Pharmacy for the dispensation of compound medications, and ultimately to find formulas for high-adjudication compound medications.

55.     These high-adjudication compound medications included numerous active and inactive ingredients. Some of these ingredients were included in the compound medications solely to increase the reimbursement amounts, despite these ingredients having no medical efficacy as utilized.

56.     These high-adjudication compound medication formulas were necessarily determined prior to receiving prescriptions, and therefore without having any specific beneficiary or member's individual medical needs identified.

57.     Although compound medications were required to be individualized to the needs of specific patients to be exempt from FDA approval, Special Care Pharmacy, at the direction of **BARRETT** and **RUTLAND**, created preprinted, "check-the-box" prescription pads containing these previously determined high-adjudication compound medications.

58.     Special Care Pharmacy, at the direction of **BARRETT** and **RUTLAND**, provided these prescription pads to marketers - that is, individuals contracted by Special Care Pharmacy to encourage practitioners to prescribe Special Care Pharmacy's high-adjudication compound medications - who would then distribute the prescription pads to practitioners. Multiple marketers

that used the pre-printed prescription pads operated out of Lamar County, located in the Eastern Division of the Southern District of Mississippi.

59.     At the direction of **BARRETT, RUTLAND**, and others, marketers would "tag" each practitioner they visited and would receive commission payments on any of the practitioner's prescriptions for high-adjudication compound medications dispensed by Special Care Pharmacy, including prescriptions for beneficiaries covered by TRICARE or other federal health care benefit programs.

### WHI, d/b/a "Rx Pro"

60.     By late 2011, due to the volume of prescriptions received for compound medications, **BARRETT** and **RUTLAND** sought to acquire additional pharmacies, and did so by purchasing ownership interests in WHI, doing business as "Rx Pro," and by forming and contracting with affiliate pharmacies.

61.     Upon acquiring WHI, **BARRETT** and **RUTLAND** continued to price-test claims to formulate high-adjudication compound medications, and further expanded their business by increasing their marketing efforts.

62.     **BARRETT** and **RUTLAND** brought on numerous marketers, including **SHOEMAKER**, to procure prescriptions for compound medications on behalf of WHI and affiliate pharmacies.  **BARRETT, RUTLAND**, and others negotiated the contracts with, and the commission percentages to be paid to, the various marketers.

63.     As the reimbursement rates changed for the ingredients included in the high-adjudication compound medications, WHI and affiliate pharmacies, at the direction of **BARRETT, RUTLAND**, and others, changed the formulas to maximize reimbursements for these

compound medications, which resulted in the preprinted, check-the-box prescription pads being updated from time to time.

64.    In an effort to further generate prescriptions for compound medications to be dispensed by WHI and affiliate pharmacies, **BARRETT** and **RUTLAND** allowed pharmacists to "tag" practitioners and receive commissions on the practitioner's prescriptions for high-adjudication compound medications produced and dispensed by WHI and affiliate pharmacies. In numerous cases, the purported practitioner claimed to have never written the prescriptions submitted by this WHI pharmacist, alleging the prescriptions were forgeries.

65.    Because TRICARE was known to pay high reimbursement rates for compound medications, WHI and affiliate pharmacies specifically targeted TRICARE beneficiaries to receive its high-adjudication compound medications. **SHOEMAKER**, being a TRICARE beneficiary, was involved in WHI and affiliate pharmacies' effort to market to TRICARE beneficiaries and practitioners serving TRICARE beneficiaries. **SHOEMAKER** and TSJ LLC received over $300,000 in commissions on numerous prescriptions reimbursed by TRICARE. In several cases, the purported practitioner claimed to have never written the prescriptions for which **SHOEMAKER** received commissions, alleging the prescriptions were forgeries.

66.    When TRICARE began to curtail its reimbursement for compound medications, WHI and affiliate pharmacies, under the management of **BARRETT** and **RUTLAND**, developed a new, pre-determined "TRICARE formula" that they knew would adjudicate for a high-dollar amount, regardless of the medical needs of any individual patient.

67.    In order to encourage practitioners to prescribe WHI and affiliate pharmacies' high-adjudication compound medications, in or around September 2012, and continuing until in or around January 2016, **BARRETT, RUTLAND**, and others formed and operated BAMBR and its

16

associated entities through which they paid practitioners kickbacks and bribes on the practitioners' prescriptions written for high-adjudication compound medications that were dispensed by WHI and affiliate pharmacies, and reimbursed by health care benefit programs.

68. In order to conceal the nature and source of the healthcare fraud proceeds that flowed through BAMBR and its associated entities, and in order to pay illegal kickback payments to practitioners, **BARRETT, RUTLAND**, and others disguised BAMBR and its associated entities as an "investment" out of which they paid prescribing practitioners "dividends," or "repurchase[d] shares." However, these payments were merely kickbacks based on the reimbursements paid on the prescriptions written for high-adjudication compound medications dispensed by WHI and affiliate pharmacies.

69. As a part of its contractual agreement with various health care benefit programs and their PBMs, WHI and affiliate pharmacies underwent audits - including, but not limited to, CVS Caremark - to ensure the adequacy of their billing and other business practices. During these audits, **RUTLAND** instructed WHI's office staff to take actions to manipulate the outcome of the audits – such as using white-out to conceal and alter information on requested documents so as to deceive the auditors and PBMs – so that WHI would not lose the ability to submit claims to these health care benefit programs for dispensing high-adjudication compound medications to beneficiaries and members.

70. On one occasion, when WHI lost its contract with a PBM after WHI performed poorly in its audit, **RUTLAND** instructed WHI to send prescriptions for members covered under that health care benefit program to affiliate pharmacies. This was done so that high-adjudication compound medications were dispensed, claims were submitted to and paid by the covering health care benefit program, and to conceal the fact that WHI was nevertheless receiving a share of the

17

reimbursements from the excluding health care benefit program, pursuant to WHI's agreements with the affiliate pharmacies.

71. Additionally, as a part of its contractual agreement with various health care benefit programs or PBMs, WHI and affiliate pharmacies were required to collect copayments from beneficiaries and members for each medication dispensed. However, as copayments for compound medications were often hundreds and even thousands of dollars per compound medication, many beneficiaries and members balked at receiving these high-adjudication compound medications if they were required to pay such an amount. Therefore, at the direction of **BARRETT**, and with the agreement of **RUTLAND**, WHI and affiliate pharmacies engaged AMS. As agreed by **BARRETT**, **RUTLAND**, and others, AMS did not provide copayment assistance, but rather merely created a paper trail to make it appear as if WHI and affiliate pharmacies had collected copayments from AMS for beneficiaries and members, when, in reality, it had not.

72. In an effort to generate a greater number of prescriptions for its high-adjudication compound medications, WHI and affiliate pharmacies, at the direction of **BARRETT**, **RUTLAND**, and others, engaged the services of Marketing Company 1 and Marketing Company 2 to cold-call beneficiaries and members and further persuade them to receive high-adjudication compound medications from WHI and affiliate pharmacies. WHI and affiliate pharmacies paid Marketing Company 1 and Marketing Company 2 approximately fifty percent (50%) of the reimbursements paid by health care benefit programs on any prescriptions referred to WHI and affiliate pharmacies for its high-adjudication compound medications.

73. Marketing Company 1 and Marketing Company 2, with the agreement of **BARRETT**, **RUTLAND**, and others, used an array of fraudulent tactics to generate prescriptions for high-

18

adjudication compound medications, including pretending to be representatives of the beneficiaries' and members' health care benefit programs, and referring prescriptions for high-adjudication compound medications to WHI and affiliate pharmacies without the beneficiaries' or members' or their prescribing practitioners' knowledge or approval.

74. Additionally, even though **BARRETT, RUTLAND**, and others knew that there was no medical necessity for the prescriptions received by WHI and affiliate pharmacies for high-adjudication compound medications from individual marketers, Marketing Company 1, Marketing Company 2, and WHI and affiliate pharmacies' staff members, **BARRETT** instructed WHI's pharmacy staff to fill the prescriptions anyway. The lack of these prescriptions' medical necessity was made apparent to **BARRETT, RUTLAND**, and others in numerous ways, including when WHI simultaneously received identical prescriptions for entire families of beneficiaries or members, as well as when WHI was told that a beneficiary's or member's doctor did not prescribe a medication, or that beneficiaries or members had received medications for conditions they did not have.

WHI, d/b/a "Aspire Rx" and Opus Rx

75. In or around May 2015, **BARRETT** and **RUTLAND** divided WHI's business enterprise between WHI and a newly created pharmacy. **RUTLAND** and others took control of WHI, and began doing business as "Aspire Rx," and **BARRETT** formed and operated Opus Rx.

76. After May 15, 2015, **BARRETT** and **RUTLAND** divided WHI's network of marketers and practitioners, as well as existing high-adjudication prescriptions previously sent to WHI but not yet filled, between WHI and Opus Rx. As a part of this arrangement, **BARRETT** and **RUTLAND** frequently sent each other prescriptions to be filled by the other's pharmacy, and proceeds of their fraud scheme owed to each other.

77. Despite this division, **SHOEMAKER** continued to send high-adjudication compound prescriptions to both WHI and Opus Rx, and continued to allow both WHI and Opus Rx to use his personal TRICARE beneficiary information to submit test claims.

78. After May, 2015, and continuing until at least January 2016, **RUTLAND** and others, through WHI, and **BARRETT** and others, through Opus Rx, continued to use networks of marketers and practitioners to procure and write prescriptions for medically unnecessary, high-adjudication compound medications produced and dispensed by WHI, Opus Rx, and affiliate pharmacies. WHI and Opus Rx overlapped as WHI's main Bancorp South account shows activity between that account, which was retained by RUTLAND, and entities and people associated with BARRETT. For example, WHI's main Bancorp South account continued to make payments to Marketing Company 1, the telemarketing firm that BARRETT retained after leaving WHI, and BARRETT continued to receive payroll payments from WHI's Bancorp South account. In addition, RUTLAND and BARRETT used their respective pharmacies to fill prescriptions for each other's pharmacies, and transferred unfilled prescriptions back and forth between each other's' pharmacies during this time.

79. Between approximately January 2011 and approximately January 2016, **BARRETT** and **RUTLAND** caused Special Care Pharmacy, WHI, Opus Rx, and affiliate pharmacies, to submit false and fraudulent claims to health care benefit programs and PBMs, including TRICARE and other federal healthcare programs, ultimately receiving approximately $180,000,000, which includes approximately $56,000,000 in reimbursements specifically from TRICARE and other federal healthcare programs.

## Money Laundering

80. Reimbursements paid to WHI by PBMs and health care benefit programs were ultimately transferred into bank accounts held by WHI and related entities, including, but not limited to, WHI's Bancorp South account No. 3983, held in Hinds County, Mississippi, over which **BARRETT**, **RUTLAND**, and others had signature authority and control between January 2013 and February 2015, and over which **RUTLAND** and others retained signature authority after February 2015.

81. From Bancorp South account No. 3983, fraud proceeds were often sent to various entities, including pass-through entities and bank accounts, and ultimately were distributed to, among others, **BARRETT**, **RUTLAND**, and **SHOEMAKER**, with financial transactions having no legitimate business purpose.

82. After receiving these proceeds, **BARRETT**, **RUTLAND**, and **SHOEMAKER** conducted monetary transactions in excess of $10,000, including the purchase of numerous assets, such as real estate, automobiles, and other luxury goods.

## COUNT 1

### The Conspiracy and Its Objects

83. Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

84. Beginning in or around January 2011, and continuing through in or around January 2016, in Hinds and Madison Counties, in the Southern District of Mississippi, and elsewhere, the **Defendants**,

**MITCHELL "CHAD" BARRETT,**
**DAVID "JASON" RUTLAND, and**
**THOMAS "TOMMY" WILBURN SHOEMAKER**

did conspire and agree with each other, and others known and unknown to the Grand Jury:

a. to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, TRICARE, Blue Cross, and other federal and private health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of TRICARE, Blue Cross, and other federal and private health care benefit programs, in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347; and

b. to knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

85. It was a purpose of the conspiracy for **BARRETT, RUTLAND, SHOEMAKER**, and others to unlawfully enrich themselves, as described in paragraphs 49 through 82 of this Indictment, which are re-alleged and incorporated by reference as though fully set forth herein.

### Manner and Means of the Conspiracy

86. In furtherance of the conspiracy and to accomplish its objects and purpose, the methods, manner, and means that were used are described in paragraphs 51 through 82 of this Indictment, and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

### COUNT 2

### The Conspiracy and Its Objects

87. Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

88. Beginning in or around January 2011, and continuing through in or around January

2016, in Hinds and Madison Counties, in the Southern District of Mississippi, and elsewhere, the

Defendants,

**MITCHELL "CHAD" BARRETT,**
**DAVID "JASON" RUTLAND, and**
**THOMAS "TOMMY" WILBURN SHOEMAKER**

did knowingly and intentionally conspire and agree with each other and others known and

unknown to the Grand Jury, to commit offenses against the United States, namely:

a. to defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of the United States Department of Defense in its administration and oversight of TRICARE;

b. to knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, TRICARE, in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A); and

c. to knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, TRICARE, in violation of Title 42, United States Code, Sections 1320a-7b(b)(2)(A).

### Overt Acts

89.     In furtherance of the conspiracy, and to accomplish its objects and purpose, **BARRETT,**

**RUTLAND, SHOEMAKER**, and others committed and caused to be committed, in Hinds and

Madison Counties, in the Southern District of Mississippi, and elsewhere, the following overt acts:

90.     Between approximately February 25, 2015 and April 22, 2015, WHI received funds as

reimbursements from health care benefit programs, into WHI's Bancorp South account No.

xxx3983, over which **RUTLAND** had signature authority for all or a portion of this period. WHI

then paid remuneration, all of which constituted kickbacks and bribes in exchange for referring

TRICARE prescriptions for high-margin compound medications dispensed to beneficiaries, from

Bancorp South account No. xxx3983, to Marketing Company 1, in accordance with the August 2014 marketing agreement negotiated between **BARRETT** and Marketing Company 1, and signed by **BARRETT** and a representative of Marketing Company 1. Those payments included, among others, the following electronic funds transfer or wire transfer payments being deposited into Marketing Company 1's Wells Fargo account No. xxx0248:

| Overt Act | Payment Date | Payment Type | Payment Amount |
|---|---|---|---|
| a. | 02/25/2015 | EFT | $350,000.00 |
| b. | 03/04/2015 | WIRE | $50,000.00 |
| c. | 03/06/2015 | WIRE | $65,185.73 |
| d. | 03/09/2015 | WIRE | $322,664.87 |
| e. | 03/20/2015 | WIRE | $413,997.76 |
| f. | 04/08/2015 | WIRE | $533,526.27 |
| g. | 04/22/2015 | EFT | $4,540.39 |
| | | Total: | $1,739,915.02 |

91.    On May 2, 2015, McDaniel Pharmacy ("McDaniel"), an affiliate pharmacy, filled prescription 200817 for "Patient A," a TRICARE beneficiary. Patient A's prescription was referred to McDaniel by Marketing Company 2. McDaniel then submitted a claim for Patient A's prescription 200817 to TRICARE, for which TRICARE paid McDaniel $8,189.04. Then, on May 4, 2015, Rx Pro of Alabama, another affiliate pharmacy, filled prescription 200557 for TRICARE beneficiary "Patient B." This prescription was sent to Rx Pro by Marketing Company 2. Rx Pro submitted a claim for this prescription to TRICARE, for which TRICARE paid Rx Pro $2,071.33. On May 8, 2015, Rx Pro, yet another affiliate pharmacy, filled two different compound drug prescriptions for TRICARE beneficiary "Patient C." Both prescriptions were sent to Rx Pro by Marketing Company 1. Rx Pro submitted claims for each of these prescriptions (prescriptions 200800 and 200801) to TRICARE. TRICARE then paid Rx Pro $557.07 for prescription 200800 and $1,169.50 for prescription 200801.

24

92.    On June 5, 2015, Opus Rx sent Marketing Company 1 accounting reports detailing the prescriptions for which Marketing Company 1 and Marketing Company 2 were credited for the month of May 2015. The report for Marketing Company 1 included TRICARE prescriptions 200800 and 200801 for Patient C. The report for Marketing Company 2 included TRICARE prescription 200817 for Patient A, and 200557 for Patient B. The Marketing Company 1 report indicated that prescriptions credited to Marketing Company 1 during May 2015 – including the aforementioned TRICARE prescription – generated a total of $1,210,969.77, fifty percent of which Opus notified Marketing Company 1 it would pay Marketing Company 1 that day. Similarly, the Marketing Company 2 report noted that Marketing Company 2 had generated $452,767.98 for Opus Rx – including the aforementioned TRICARE prescriptions – fifty percent of which would also be paid to Marketing Company 2 that day.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 3 - 10

93.    Paragraphs 1 through 82 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

94.    On or about the dates set forth below, in Hinds and Madison Counties, in the Southern District of Mississippi, and elsewhere, the defendants,

**MITCHELL "CHAD" BARRETT and**
**DAVID "JASON" RUTLAND,**

aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully offered and paid remuneration, and knowingly and willfully aided, abetted, counseled, commanded, induced, and otherwise caused others to offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service

25

for which payment may be made in whole and in part under a Federal health care program as defined in Title 42, United States Code, Section 1320a-7b(f), that is, TRICARE, as set forth below.

95.    On June 26, 2015, WHI's Bancorp South account No. 3983 received $254,294.87 in reimbursements from TRICARE through its PBM.  On July 3, 2015, WHI's Bancorp South account No. 3983 transferred, via electronic funds transfer, $53,500 to BAMBRUT10's Bancorp South account No. 3134.  After receiving this transfer, defendants **BARRETT** and **RUTLAND** made the following payments, or caused the following payments to be sent, from BAMBRUT10's Bancorp South account No. 3134 to the following individuals and entities:

| Count | Individual/Entity Receiving Payment | Approximate Date of Payment | Amount |
|---|---|---|---|
| 3 | [DR.] JEFFREY LEE STEWART | 7/7/2015 | $2,300 |
| 4 | [DR.] CLARK CHRISTIAN LARSEN | 7/7/2015 | $4,500 |
| 5 | [DR.] DAVID CRAIG LOUCKS | 7/8/2015 | $10,503 |
| 6 | [DR.] JASON DON CAMPBELL | 7/8/2015 | $9,750 |
| 7 | BRANDON JONES CONSULTING SERVICES | 7/8/2015 | $9,250 |
| 8 | [DR.] COLBY H FROST | 7/10/2015 | $9,750 |
| 9 | [DR.] CLINT LARSEN | 7/13/2015 | $2,275 |
| 10 | CENTENNIAL MEDICAL SERVICES | 7/16/2015 | $5,300 |
| | | Total: | $53,628 |

Each of the above is a violation of Title 42, United States Code, Section 1320a-7b(b) and Title 18, United States Code, Section 2.

### COUNT 11

### The Conspiracy and Its Objects

96.    Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

97.    From in or before December 2013, and continuing through in or around January 2016, within the Southern District of Mississippi, and elsewhere, the Defendants,

### MITCHELL "CHAD" BARRETT,

26

did knowingly and intentionally conspire and agree with other persons, known and unknown to

the Grand Jury:

a. to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18 United States Code, Section 371, and pay and receive health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and

b. to knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, said property being derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

### Purpose of the Conspiracy

98.     It was a purpose of the conspiracy to conduct financial transactions representing the

proceeds of specified unlawful activities, that is, conspiracy to commit wire fraud and healthcare

fraud in violation of Title 18, United States Code, Section 1349, conspiracy to commit offenses

against the United States, in violation of Title 18, United States Code, Section 371, and conspiracy

to pay and receive health care kickbacks, in violation of Title 42, United States Code, Section

1320a-7b(b), and to conceal said proceeds by obscuring their nature, location, source, ownership,

and control. It was also a purpose of this conspiracy to engage in monetary transactions of a value

greater than $10,000 using these proceeds.

### Manner and Means

99.     The following were among the manner and means used by **BARRETT, RUTLAND,**

**SHOEMAKER,** and others to accomplish the objects of the conspiracy:

27

100. **BARRETT, RUTLAND, SHOEMAKER**, and their co-conspirators, directed the proceeds earned through WHI, and those derived from conspiracy to commit wire fraud and healthcare fraud, conspiracy to commit offenses against the United States, and to pay and receive health care kickbacks, to accounts in the name of WHI.

101. **BARRETT, RUTLAND, SHOEMAKER**, and their co-conspirators directed funds, via electronic funds transfer, wire transfer, or check, from accounts in the name of WHI to shell entities used to further launder the funds, purchase real property, and benefit themselves.

102. **BARRETT, RUTLAND, SHOEMAKER**, and their co-conspirators used LLCs, nominees, trusts, and other entities to obscure and conceal the fraud proceeds.

103. **BARRETT, RUTLAND, SHOEMAKER**, and their co-conspirators used BAMBR, and BAMBR-related bank accounts, to conceal the nature, source, and origin of fraud proceeds that were then used to pay illegal kickbacks.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 12

104. Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

105. On or about June 29, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

## MITCHELL "CHAD" BARRETT,

did conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, causing a wire transfer from Community Trust Bank account No. xxx9720 in the name of Farm007 Holdings to Origins Bank account No. xxx3311 in the name of Farm 007 Holdings for $2,000,000.00, which involved the proceeds of a specified unlawful activity, that is,

28

conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18 United States Code, Section 371, and to pay and receive health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i).

## COUNT 13

106. Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

107. On or about September 8, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

### DAVID "JASON" RUTLAND,

did conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, causing an electronic funds transfer from Bancorp South account No. xxx7430 in the name of Jason Rutland to Bancorp South account No. xxx8214 in the name of Rutland Family Trust for $200,000.00, which involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18, United States Code, Section 371, and to pay and receive health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b),

29

knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i).

## COUNT 14

108.    Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

109.    On or about December 15, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

### DAVID "JASON" RUTLAND,

did conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, engaging in a financial transaction, to wit: the purchase of a 2016 Dodge Ram 5500 truck from Howard Wilson automotive dealership for approximately $48,888, which involved the trade-in of a 2015 GMC Sierra pickup truck and payment by check No. 1264, drawn on Bancorp South account No. xxx0665 in the name of Rutland Company LLC, in the amount of $5,000, paid to Howard Wilson automotive dealership; both check No. 1264 and the 2015 GMC Sierra pickup truck involving the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18, United States Code, Section 371, and to pay and receive health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location,

30

source, ownership, and control of the proceeds of specified unlawful activity and, that while conducting and attempting to conduct such financial transaction, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i).

## COUNT 15

110. Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

111. On or about July 14, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

### DAVID "JASON" RUTLAND,

did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, specifically, making a payment by check No. 1188 drawn on Bancorp South account No. xxx7430 in the name of Jason Rutland, to Diamond Sales, for the purchase of a three-carat diamond bearing GIA number 2165688215, in the amount of $34,560, which involved the proceeds of a specified unlawful activity, that is, conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18, United States Code, Section 371, and to pay and receive health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), in violation of Title 18, United States Code, Sections 1957.

31

## COUNT 16

112.    Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

113.    On or about November 12, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

### THOMAS "TOMMY" WILBURN SHOEMAKER,

did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, specifically, the purchase of a 2008 Porsche 911 ("Porsche 2"), with a purchase price of approximately $74,145.09, purchased via the trade in of a 2010 Porsche 911 ("Porsche 1"), Porsche 1 representing the proceeds of a specified unlawful activity, that is, conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18, United States Code, Section 371, and to pay and receive health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), in violation of Title 18, United States Code, Sections 1957.

## COUNT 17

114.    Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

115.    On or about June 29, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

### MITCHELL "CHAD" BARRETT,

did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, specifically, making a payment by check No. 1134 drawn

on Bank Plus account No. xxx0111 in the name of BrewBarr LLC, in the amount of $207,431.29, to BankPlus for a certified check for the purchase of 132 Lakeway Drive, Madison, Mississippi, which involved the proceeds of a specified unlawful activity, that is, conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18, United States Code, Section 371, and to pay and receive health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), in violation of Title 18, United States Code, Sections 1957.

## COUNT 18

116. Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

117. On or about December 12, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

## MITCHELL "CHAD" BARRETT,

did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, specifically, the purchase of a 2016 Mercedes-Benz CLS63AMG S, VIN # WDDLJ7GB8GA172166, which involved the trade in of a 2012 Mercedes-Benz CLS63AMG and a 2014 Mercedes-Benz GL350, and a payment by check No. 1155, drawn on Bank Plus account No. xxx0111 in the name of BrewBarr LLC, in the amount of $4,000, made out to "Higginbotham," all of which involved the proceeds of a specified unlawful activity, that is, conspiracy to commit wire fraud and healthcare fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit offenses against the United States related to a health care benefit program, in violation of Title 18, United States Code, Section 371, and to pay and receive

33

health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), in violation of Title 18, United States Code, Sections 1957.

## COUNT 19

118.  Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

119.  On or about January 22, 2016, in the Southern District of Mississippi, and elsewhere, the defendant,

## MITCHELL "CHAD" BARRETT,

before, during, and after any search for and seizure of property by any person authorized to make such search of seizure, did knowingly destroy, damage, waste, dispose of, transfer, and otherwise take any action, and knowingly attempt to destroy, damage, waste, dispose of, transfer, and otherwise take any action, for the purpose of preventing and impairing the Government's lawful authority to take such property into its custody and control and to continue holding such property under its lawful custody and control, to wit: by transferring $722,886 out of the Farm 007 Holdings Community Trust account No. xxx9720, in violation of Title 18, United States Code, Section 2232(a).

## COUNT 20

120.  Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

121.  On or about February 9, 2016, in the Southern District of Mississippi, and elsewhere, the defendant,

## MITCHELL "CHAD" BARRETT,

before, during, and after any search for and seizure of property by any person authorized to make

34

such search of seizure, did knowingly destroy, damage, waste, dispose of, transfer, and otherwise take any action, and knowingly attempt to destroy, damage, waste, dispose of, transfer, and otherwise take any action, for the purpose of preventing and impairing the Government's lawful authority to take such property into its custody and control and to continue holding such property under its lawful custody and control, to wit: transferring ownership of 132 Lakeway Dr., Madison, Mississippi, in violation of Title 18, United States Code, Section 2232(a).

## COUNT 21

122. Paragraphs 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

123. On or about February 27, 2016, in the Southern District of Mississippi, and elsewhere, the defendant,

## MITCHELL "CHAD" BARRETT,

before, during, and after any search for and seizure of property by any person authorized to make such search of seizure, did knowingly destroy, damage, waste, dispose of, transfer, and otherwise take any action, and knowingly attempt to destroy, damage, waste, dispose of, transfer, and otherwise take any action, for the purpose of preventing and impairing the Government's lawful authority to take such property into its custody and control and to continue holding such property under its lawful custody and control, to wit: by transferring ownership of 105 Bonnabel Place, West Monroe, Louisiana, in violation of Title 18, United States Code, Section 2232(a).

## FORFEITURE ALLEGATIONS

124. Upon conviction of any of the offenses alleged in Counts 1 through 10 of this Indictment, the **Defendants** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7).

125. Upon conviction of the offense alleged in Count 2 of this Indictment, the **Defendants** shall also forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C); and Title 28, United States Code, Section 2461(c).

126. Upon conviction of any of the offenses alleged in Counts 11 through 18 of this Indictment, the **Defendants** shall forfeit to the United States and any property, real or personal, involved in these offenses, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

127. The grand jury finds probable cause that, based on the evidence provided during presentment, the following property is subject to forfeiture:

| Criminal Forfeiture Identifier | Identifier from parallel Civil Case *United States v. Real Property Located at 19 Crane Park*, 2:18-cv-165 | Asset Description |
|---|---|---|
| A1 | A-001 | $1,001,417.67 seized from Bancorp South Bank account number 60513983, an account in the name of World Health Industries Inc. (16-DCI-000076) |
| A2 | A-006 | $242,222.91 seized from Bancorp account number 75627430, an account in the name of David Jason Rutland. (16-DCI-000078) |
| A3 | A-007 | $31,534.15 seized from Bancorp account number 75140665, an account in the name of Rutland Company, LLC. (16-DCI-000079) |
| A4 | A-015 | $727.06 seized from Bancorp account number 75887760, an account in the name of World Health Holding Company, Inc. (16-DCI-000077) |
| A5 | A-011 | $529,197.81 seized from Regions account number 49648314, an account in the name of Performance Accounts Receivable, LLC. (16-FBI-002430) |
| A6 | A-016 | $5,228.32 seized from Bancorp account number 75113324, an account in the name of World Health Jets, LLC. (16-DCI-000080) |

| | | |
|---|---|---|
| B1 | B-004 | Cash/Currency in lieu of 2014 Mercedes Benz E350, VIN WDDHF5KB8EA888307, Tag MS HRY613, with all attachments thereon, registered to RX Pro of Mississippi, Inc. (16-FBI-001425) |
| B2 | B-007 | Cash/Currency in lieu of 2008 Porsche 911, VIN WPOCD299X8S788297, Tag MS P034J, with all attachments thereon registered to Thomas Shoemaker. (16-FBI-001498) |
| B3 | B-008 | 2014 Mercedes Benz C Class, VIN WDDGJ7HB5EG187198, Tag MS HYR410, with all attachments thereon, registered to Farm007, LLC or Thomas Shoemaker. |
| B4 | B-009 | Cash/Currency in lieu of 2014 Land Rover, VIN SALWR2EF3EA336714, Tag MS HSC678, with all attachments thereon, registered to World Health Industries, Inc. (16-FBI-001304) |
| B5 | B-010 | Cash/Currency in lieu of 2012 Mercedes Benz ML3, VIN 4JGA5HB6CA023861, Tag MS HSG642, with all attachments thereon, registered to Farm007, LLC. (16-FBI-001426) |
| B6 | B-013 | 2015 Mercedes Benz GL, VIN 4JGDF2EE3FA577183, Tag MS HYQ545, with all attachments thereon, registered to Morgan Hollingsworth. (16-FBI-001305) |
| B7 | B-014 | Cash/Currency in lieu of 2016 Dodge Ram 5500, VIN 3C7WRNFL5GG179742, with all attachments thereon, registered to The Rutland Company, LLC. (16-FBI-001383) |
| B8 | B-015 | 2014 Chevrolet Silverado 3500, VIN 1GB4CZC83EF173325, Tag MS B103AQ274, with all attachments thereon, registered to World Health Construction Management Group. |
| B9 | B-031 | 2016 Mercedes-Benz CLS63AMG S, VIN WDDLJ7GB8GA172166, with all attachments thereon, registered to Chad Barrett and Brew Barr, LLC. |
| B10 | N/A | A three-carat diamond purchased by Jason Rutland on or about July 13, 2018 for $34,500 and bearing the inscription GIA 2165688215. |
| B11 | N/A | World Cat 320, Hull Identification Number EPY03557K516 |
| C1 | C-001 | 2278 Martin Road, Bolton, Mississippi, Hinds County, (296.31 Acres) including parcels 4967-545, 4967-545-1, 4967-546, 4967-546-3, 4967-546-4,4967-546-5 & 4967-547-2, titled to the Rutland Family Trust. (17-DCI-000086) |

| C2 | C-009 | 4944 Hickory Shores Blvd., Gulf Breeze, Florida Santa Rosa County, titled to Chad and Jonnita Barrett. (16-DCI-000126) |
| C3 | C-010 | 132 Dunlieth Way, Clinton, Mississippi, Hinds County, titled to Brew Barr LLC. (16-DCI-000127) |
| C4 | C-011 | Lot 16 (Parcel 2980-208-516) and Lot 18 (Parcel 2980-208-518), Dunlieth Way, Clinton, Mississippi, Hinds County, titled to Brew Barr LLC. (16-DCI-000128) |
| C5 | N/A | 105 Bonnabel Place, West Monroe, Louisiana. |

128. The United States will also seek a forfeiture money judgment against the **Defendants** in the amount of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of Counts 1 through 10, pursuant to Title 18, United States Code, Section 982(a)(7).

129. The United States will also seek a forfeiture money judgment against the **Defendants** in the amount equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to Count 2, pursuant to Title 18, United States Code, Section 981(a)(1)(C); and Title 28, United States Code, Section 2461(c).

130. The United States will also seek a forfeiture money judgment against the **Defendants** in the amount equal to the value of any property, real or personal, involved in Counts 11 through 18, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

131. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the **Defendants**:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

the **Defendants** shall forfeit to the United States any other property, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

Criminal Forfeiture, in violation of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(2), and 982(a)(7); Title 21, United States Code, 853(p); and Title 28, United States Code, Section 2461(c).

D. MICHAEL HURST, JR.
United States Attorney

A TRUE BILL:

s/ signature redacted
Foreperson of the Grand Jury

This indictment was returned in open court by the foreperson or the deputy foreperson of the Grand Jury on this the 27th day of May, 2020.

UNITED STATES MAGISTRATE JUDGE